# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Dkt. No. _____ |
| | ) | |
| THE PURDUE FREDERICK COMPANY, INC. | ) | 21 U.S.C. §§ 331(a), 352(a), 333(a)(2) |
| D/B/A The Purdue Frederick Company | ) | |
| MICHAEL FRIEDMAN | ) | 21 U.S.C. §§ 331(a), 352(a), 333(a)(1) |
| HOWARD R. UDELL | ) | 21 U.S.C. §§ 331(a), 352(a), 333(a)(1) |
| PAUL D. GOLDENHEIM | ) | 21 U.S.C. §§ 331(a), 352(a), 333(a)(1) |

## I N F O R M A T I O N

### INTRODUCTION

The United States Attorney charges that at all times relevant to this Information:

Description of Defendants

1.  Defendant The PURDUE FREDERICK COMPANY, INC. (referred to in this Information as "PURDUE"), doing business as The Purdue Frederick Company, was a New York corporation, headquartered in Connecticut. It was created in 1892 and was purchased by its current owners in 1952. At all times relevant to this Information, PURDUE and other related and associated entities were engaged in the pharmaceutical business throughout the United States.

2.  PURDUE developed and originally marketed OxyContin Tablets ("OxyContin"), an opioid analgesic approved to be taken every twelve hours. OxyContin is a controlled-release form of oxycodone and is a Schedule II controlled substance with an abuse liability similar to morphine.

3.  Defendant MICHAEL FRIEDMAN joined PURDUE in 1985 as Vice President and Assistant to the President and Chairman. He was appointed Group Vice President in 1988, Executive Vice President and Chief Operating Officer in 1999, and President and Chief Executive

Officer in 2003.

4. Defendant HOWARD R. UDELL joined PURDUE in 1977 as General Counsel. He was appointed Group Vice President and General Counsel in 1989, Executive Vice President and General Counsel in 1999, and Executive Vice President and Chief Legal Officer in 2003.

5. Defendant PAUL D. GOLDENHEIM joined PURDUE in 1985 as Medical Director. He was appointed Vice President and Medical Director in 1986, Vice President of Scientific and Medical Affairs and Executive Director of Purdue Frederick Research Center in 1988, Group Vice President of Scientific and Medical Affairs in 1989, Executive Vice President of Medical and Scientific Affairs in 1999, Executive Vice President of Worldwide Research & Development in 2000, and Executive Vice President of Worldwide Research & Development and Chief Scientific Officer in 2003. He left PURDUE in 2004.

6. From January 1996 through June 30, 2001, PURDUE received approximately $2.8 billion in revenue from the sale of OxyContin.

Statutory Framework

7. The United States Food and Drug Administration ("FDA") is the agency of the United States responsible for protecting the public health by ensuring the safety, efficacy, and security of human drugs and for enforcing the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301, *et seq.*

8. The FDCA, 21 U.S.C. § 355, required a sponsor of a new drug to receive FDA approval of a New Drug Application ("NDA"), before the sponsor could distribute the drug in interstate commerce.

9. The FDCA, 21 U.S.C. § 321(m), defined labeling to include "all labels and other

written, printed, or graphic matter . . . accompanying [a drug]." Title 21, Code of Federal Regulations, Section 202.1(*l*)(2) provided that labeling included brochures, booklets, mailing pieces, detailing pieces, bulletins, letters, motion picture films, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio, or visual matter descriptive of a drug which were disseminated by or on behalf of a drug's manufacturer, packer, or distributor. Such items "accompanied" a drug if they were designed for use and used in the distribution and sale of the drug.

10. The FDCA, 21 U.S.C. § 352(a), provided that a drug was misbranded "[i]f its labeling [was] false or misleading in any particular." The FDCA, 21 U.S.C. § 321(n), provided that "[i]n determining whether the labeling . . . [was] misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling fails to reveal facts material in the light of such representation or material with respect to the consequences which may result from the use . . . to which the labeling . . . relates under the conditions of use prescribed in the labeling . . . or under such conditions of use as are customary or usual."

11. The FDCA, 21 U.S.C. § 331(a), prohibited the introduction or delivery for introduction into interstate commerce of a misbranded drug. 21 U.S.C. § 333(a)(2) provided that such a violation committed with the intent to defraud or mislead was punishable as a felony. Under 21 U.S.C. § 333(a)(1) and the applicable case law, an individual could be held criminally liable for a misdemeanor violation of § 331(a) without having knowledge of, or intent to cause, the misbranding if that individual was a responsible corporate officer at the time of the misbranding. A responsible corporate officer for these purposes was one who had responsibility and authority either to prevent in the first instance or to promptly correct certain conduct resulting in the

misbranding of a drug introduced or delivered for introduction into interstate commerce.

12. OxyContin was a drug within the meaning of the FDCA, 21 U.S.C. § 321(g)(1), and a new drug within the meaning of 21 U.S.C. § 321(p).

### OxyContin Approval and Package Insert

13. On approximately December 28, 1994, PURDUE submitted the OxyContin NDA to the FDA. The NDA included clinical studies showing that OxyContin, when dosed every twelve hours, was as safe and as effective as immediate-release oxycodone dosed every six hours.

14. The NDA did not claim that OxyContin was safer or more effective than immediate-release oxycodone or other pain medications and PURDUE did not have, and did not provide the FDA with, any clinical studies demonstrating that OxyContin was less addictive, less subject to abuse and diversion, or less likely to cause tolerance and withdrawal than other pain medications.

15. On or about October 24, 1995, the FDA completed, with PURDUE's assistance, an internal Medical Officer Review ("MOR") of the Integrated Summary of Safety ("ISS") and a MOR of the Integrated Summary of Efficacy ("ISE"). While not binding on the company, the MORs were disclosed to certain PURDUE supervisors and employees. These MORs did not state that OxyContin was more effective than or superior to, safer, had less opioid effects, or caused fewer adverse events than any other marketed product.

16. The MOR of the ISS included these statements:

    a. "The blood level data in clinical use suggests the opioid effects [of OxyContin and immediate-release oxycodone] would be similar;"

    b. "The best conclusion is that the efficacy of [OxyContin] is equivalent to the [immediate-release oxycodone], with an adverse event profile that is as good as the [immediate-release oxycodone]. <u>I would not allow a 'better' claim</u>." (emphasis in original);

c. "The adverse experience profile of [OxyContin] is qualitatively similar to that of the parent drug, oxycodone;" and

d. "Withdrawal is possible in patients who have their dosage abruptly reduced or discontinued."

17. The MOR of the ISE included these statements:

a. "There is <u>some</u> evidence, both pharmacokinetic and clinical, that reduced acute opioid adverse effects may be expected in some patients, but there is not enough evidence to support an [adverse event] superiority claim [for OxyContin] against other marketed products." (emphasis in original); and

b. "Care should be taken to limit competitive promotion. [OxyContin] has been shown to be as good as current therapy, but has not been shown to have a significant advantage beyond reduction in frequency of dosing."

18. The FDA approved the OxyContin NDA on December 12, 1995, and from 1996 through June 30, 2001, the FDA-approved package insert for OxyContin stated that it was intended for "the management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days." The package insert also included the statement: "Delayed absorption, as provided by OxyContin tablets, is believed to reduce the abuse liability of a drug."

## Misbranding of OxyContin

19. During the period February through March 1995, PURDUE supervisors and employees obtained market research that included focus groups of forty primary care physicians, rheumatologists, and surgeons to determine their receptivity to using OxyContin for non-cancer pain. According to this market research, some of these physicians had concerns, similar to their concerns about combination opioids, regarding OxyContin's addictive potential and side effect profile, including that "[t]he biggest negative of [OxyContin] was the abuse potential."

20. Beginning on or about December 12, 1995, and continuing until on or about June 30, 2001, certain PURDUE supervisors and employees, with the intent to defraud or mislead, marketed

and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications, as follows:

    a. Trained PURDUE sales representatives and told some health care providers that it was more difficult to extract the oxycodone from an OxyContin tablet for the purpose of intravenous abuse, although PURDUE's own study showed that a drug abuser could extract approximately 68% of the oxycodone from a single 10 mg OxyContin tablet by crushing the tablet, stirring it in water, and drawing the solution through cotton into a syringe;

    b. Told PURDUE sales representatives they could tell health care providers that OxyContin potentially creates less chance for addiction than immediate-release opioids;

    c. Sponsored training that taught PURDUE sales supervisors that OxyContin had fewer "peak and trough" blood level effects than immediate-release opioids resulting in less euphoria and less potential for abuse than short-acting opioids;

    d. Told certain health care providers that patients could stop therapy abruptly without experiencing withdrawal symptoms and that patients who took OxyContin would not develop tolerance to the drug; and

    e. Told certain health care providers that OxyContin did not cause a "buzz" or euphoria, caused less euphoria, had less addiction potential, had less abuse potential, was less likely to be diverted than immediate-release opioids, and could be used to "weed out" addicts and drug seekers.

<u>Misbranding of OxyContin: Use of Graphical Depictions by Sales Representatives</u>

21. Data from one of PURDUE's clinical studies was used to create the following graphical demonstration of the difference in the plasma levels at steady state between patients who

took OxyContin every twelve hours (the "10 mg CR" line) and patients who took immediate-release oxycodone every six hours (the "5 mg IR" line):



22. On October 12, 1995, PURDUE requested comments from the FDA's Division of Drug Marketing, Advertising, and Communication ("DDMAC") about its proposed launch marketing materials, which included the following graph and text showing the oxycodone plasma concentration provided by OxyContin on a logarithmic scale along with the statement that OxyContin's oxycodone blood plasma levels provided "fewer 'peaks and valleys' than with immediate-release oxycodone:"



23. On or about December 20, 1995, after reviewing the proposed OxyContin launch materials, DDMAC informed PURDUE that "[i]f [Purdue] wishes to compare blood levels in the text, then DDMAC suggests that the blood levels for both dosage forms be presented in the graphic so that the reader can accurately interpret this claim."

24. On or about January 11, 1996, PURDUE told DDMAC that it had "deleted" the statement "[f]ewer peaks and valleys than with immediate-release oxycodone."

25. In or about December 1998, PURDUE sponsored training for all of its district sales managers. During this meeting, a pharmacist retained by PURDUE to conduct a portion of the training used the following graphical demonstration (instead of the graphical demonstration of the actual clinical data described in paragraph 21 of the Introduction of this Information), and falsely stated that OxyContin had significantly fewer "peak and trough" blood level effects than immediate-release opioids resulting in less euphoria and less potential for abuse than short-acting opioids:



26. Beginning in or around 1999, some of PURDUE's new sales representatives were permitted, during training at PURDUE's headquarters, to draw their own blood level graphs to falsely represent that OxyContin, unlike immediate-release or short-acting opioids, did not swing up and down between euphoria and pain and resulted in less abuse potential.

27. During the period 1999 through June 30, 2001, certain PURDUE sales representatives used graphical depictions similar to the one described in paragraph 25 of the Introduction of this Information and falsely stated to some health care providers that OxyContin had less euphoric effect and less abuse potential than short-acting opioids.

Misbranding of OxyContin: Misleading Use of Article to Claim No Withdrawal or Tolerance

28. On or about January 16, 1997, certain PURDUE supervisors and employees sent to the FDA the results of a clinical study pertaining to the use of low doses of OxyContin by

osteoarthritis patients ("osteoarthritis study") and a final study report that included, in a section pertaining to respite periods, the statement "[n]o investigator reported 'withdrawal syndrome' as an adverse experience during the respite periods." In a section entitled "Adverse Experiences by Body System During Respite Periods," the report's summary of the major results listed the most frequently reported adverse experiences in respite periods to be nervousness, insomnia, nausea, pain, anxiety, depression, and diarrhea, followed by the statement: "Twenty-eight patients (26%) had symptoms recorded during 1 or more respite periods."

29. In or about May 1997, certain PURDUE supervisors and employees stated that while they were well aware of the incorrect view held by many physicians that oxycodone was weaker than morphine, they did not want to do anything "to make physicians think that oxycodone was stronger or equal to morphine" or to "take any steps in the form of promotional materials, symposia, clinicals, publications, conventions, or communications with the field force that would affect the unique position that OxyContin ha[d] in many physicians mind (*sic*)."

30. On or about February 12, 1999, certain supervisors and employees of a United Kingdom company affiliated with PURDUE provided certain PURDUE supervisors and employees with an analysis of the osteoarthritis study together with another clinical study. This analysis included a list of eight patients in the osteoarthritis study and eleven patients in the other study "who had symptoms recorded that may possibly have been related to opioid withdrawal," including one patient in the other study who required treatment for withdrawal syndrome. The "Discussion" section of this analysis included the following: "It is not surprising that some patients in the clinical trials developed some degree of physical dependence and consequently experienced withdrawal symptoms as a result of abrupt discontinuation of OxyContin tablets. All patients who were

*Attachment F to Plea Agreement*
*United States v. The Purdue Frederick Co., Inc.*     Page 10 of 16

suspected to have withdrawal symptoms have been reported but this may have resulted in a falsely high incidence. Of the patients who participated in [the osteoarthritis study] (in which patients entered respite periods without OxyContin tablets) many symptoms suspected to be due to opioid withdrawal may simply have resulted from the return of pain. After withdrawal of OxyContin tablets, patient 6007 complained of nervousness, patient 2004 complained of insomnia and felt restless and patients 2020 and 2028 were restless and anxious. Since these are symptoms which often accompany the return of significant pain, it may be wrong to label these as withdrawal symptoms. Nonetheless, the incidence of withdrawal syndromes in patients treated with OxyContin tablets is a concern and it is safer to over report, than under report this potential problem." The analysis' conclusions included the statement: "As expected, some patients did become physically dependent on OxyContin tablets but this is not expected to be a clinical problem so long as abrupt withdrawal of drug is avoided."

31. Certain PURDUE supervisors and employees participated in the drafting of an article regarding the osteoarthritis study that was published in a medical journal on or about March 27, 2000 ("osteoarthritis study article"). The "Results" section of the article included the following three statements pertaining to the incidence of withdrawal syndrome and withdrawal symptoms experienced by study patients: (1) One patient was hospitalized "for withdrawal symptoms . . . . The patient who was hospitalized with withdrawal symptoms had completed the study on the previous day and had been receiving CR oxycodone, 70 mg/d; symptoms resolved after 3 days." (2) "A second patient, who was receiving 60 mg/d CR oxycodone, experienced withdrawal symptoms after running out of study medication. The patient had not reported withdrawal symptoms during scheduled respites from doses of 30 or 40 mg/d." (3) "Withdrawal syndrome was not reported as

an adverse event for any patient during scheduled respites. Adverse experiences reported by more than 10% of patients during scheduled respites were nervousness (9 patients) and insomnia (8 patients)."

32. The osteoarthritis study article also included a "Comment" section. The statement regarding withdrawal in this section largely summarized the information in the three statements in the "Results" section and further suggested that patients taking low doses could have their OxyContin treatment abruptly discontinued without experiencing withdrawal if their condition so warranted: "There were 2 reports of withdrawal symptoms after patients abruptly stopped taking CR oxycodone at doses of 60 or 70 mg/d. Withdrawal syndrome was not reported as an adverse event during scheduled respites, indicating that [OxyContin] at doses below 60 mg [per day] can be discontinued without tapering the dose if the patient's condition so warrants."

33. On or about May 18, 2000, after millions of OxyContin tablets had been sold and used by patients, PURDUE's Medical Services Department reported to certain PURDUE supervisors and employees that it had recently received a report of a patient who said he or she was unable to stop taking OxyContin 10 mg every 12 hours without experiencing withdrawal symptoms and the report indicated that "this type of question, patients not being able to stop OxyContin without withdrawal symptoms has come up quite a bit here in Medical Services lately (at least 3 calls in the last 2 days)."

34. On or about June 26, 2000, certain PURDUE supervisors and employees sent the full text of the osteoarthritis study article together with a "marketing tip" to PURDUE's entire sales force. The marketing tip stated that a reprint of the osteoarthritis study article was available for use in achieving sales success. The marketing tip also included as one of the article's twelve key points:

"There were 2 reports of withdrawal symptoms after patients abruptly stopped taking CR oxycodone at doses of 60 or 70 mg/d. Withdrawal syndrome was not reported as an adverse event during scheduled respites indicating that CR oxycodone at doses below 60 mg/d can be discontinued without tapering the dose if the patient condition so warrants."

35. On or about February 13, 2001, certain PURDUE supervisors and employees received a review of the accuracy of the withdrawal data in the osteoarthritis study that stated: "Upon a review of all comments for all enrolled patients, it was noted that multiple had comments which directly stated or implied that an adverse experience was due to possible withdrawal symptoms." This was followed by a list of eleven study patients who reported adverse experience due to possible withdrawal symptoms during these periods. 106 patients initially participated in the osteoarthritis study, 32 of them withdrew because of adverse events (not necessarily related to withdrawal), and 38 patients remained in the study at 12 months.

36. On or about March 28, 2001, a PURDUE employee emailed a PURDUE supervisor regarding the review of withdrawal data described in paragraph 35 of the Introduction of this Information, asking: "Do you think the withdrawal data from the [osteoarthritis] study . . . is worth writing up (an abstract)? Or would this add to the current negative press and should be deferred?" The supervisor responded: "I would not write it up at this point." No abstract was prepared.

37. Between approximately June 26, 2000, and June 30, 2001, certain PURDUE supervisors and employees distributed copies of the reprint of the osteoarthritis study article to all of PURDUE's sales representatives for use in the promotion and marketing of OxyContin to health care providers, including the distribution of 10,615 copies to certain PURDUE sales representatives between February 13, 2001, and June 30, 2001.

38. During the period June 26, 2000, through June 30, 2001, certain PURDUE sales representatives distributed the reprint of the osteoarthritis study article to some health care providers and falsely or misleadingly stated that patients taking OxyContin at doses below 60 milligrams per day can always be discontinued abruptly without withdrawal symptoms and that patients on such doses would not develop tolerance.

Misbranding of OxyContin: Use of Reduced Abuse Liability Claim in Marketing

39. The original OxyContin package insert approved by the FDA stated: "Delayed absorption, as provided by OxyContin tablets, is believed to reduce the abuse liability of a drug" (the *Reduced Abuse Liability Statement*). Certain PURDUE supervisors and employees instructed PURDUE sales representatives to use this statement to market and promote OxyContin.

40. Certain PURDUE sales representatives, while promoting and marketing OxyContin, falsely told some health care providers that the *Reduced Abuse Liability Statement* meant that OxyContin did not cause a "buzz" or euphoria, caused less euphoria, had less addiction potential, had less abuse potential, was less likely to be diverted than immediate-release opioids, and could be used to "weed out" addicts and drug seekers.

41. By March 2000, various PURDUE supervisors and employees in different parts of the company had received reports of OxyContin abuse and diversion occurring in different communities.

42. On or about November 27, 2000, certain PURDUE supervisors and employees amended the *Reduced Abuse Liability Statement* to state that "[d]elayed absorption, as provided by OxyContin tablets, when used properly for the management of pain, is believed to reduce the abuse liability of a drug," and instructed PURDUE sales representatives to use the amended statement to

promote and market OxyContin.

43. From March 2000 through June 30, 2001, certain PURDUE sales representatives, while promoting and marketing OxyContin, falsely told some health care providers that the *Reduced Abuse Liability Statement* and the amended statement meant that OxyContin did not cause a "buzz" or euphoria, caused less euphoria, had less addiction potential, had less abuse potential, was less likely to be diverted than immediate-release opioids, and could be used to "weed out" addicts and drug seekers.

## COUNT ONE
### Introduction of Misbranded Drug into Interstate Commerce
### 21 U.S.C. §§ 331(a), 352(a), 333(a)(2)

1. The Introduction of this Information is realleged and made a part of this Count.

2. In or about and between January 1996 and June 30, 2001, in the Western District of Virginia and elsewhere, defendant The PURDUE FREDERICK COMPANY, INC. doing business as The Purdue Frederick Company, with the intent to defraud or mislead, introduced and caused the introduction into interstate commerce of quantities of OxyContin from various locations outside the state of Virginia to various locations in the Western District of Virginia and elsewhere, which were misbranded within the meaning of 21 U.S.C. §§ 331(a), 333(a)(2), and 352(a), in that the matters described in paragraphs 19 through 43 of the Introduction of this Information constituted labeling within the meaning of 21 U.S.C. § 321(m) and were false and/or misleading.

All in violation of 21 U.S.C. §§ 331(a), 352(a), and 333(a)(2).

## COUNT TWO
### Introduction of Misbranded Drug in Interstate Commerce
### 21 U.S.C. §§ 331(a), 352(a), and 333(a)(1)

The United States Attorney charges that:

1. The Introduction of this Information is realleged and made a part of this Count.

2. Between in or about January 1996 and on or about June 30, 2001, defendants MICHAEL FRIEDMAN, HOWARD R. UDELL, and PAUL D. GOLDENHEIM, were senior executives of The PURDUE FREDERICK COMPANY, INC., doing business as The Purdue Frederick Company, and were responsible corporate officers under 21 U.S.C. §§ 331(a), 333(a)(1), and 352(a) during the time that THE PURDUE FREDERICK COMPANY, INC., introduced and caused the introduction into interstate commerce of quantities of OxyContin from various locations outside the state of Virginia to various locations in the Western District of Virginia and elsewhere, which were misbranded as described in paragraphs 19 through 43 of the Introduction and Count One of this Information.

All in violation of Title 21, United States Code, Sections 331(a), 352(a), and 333(a)(1).

Date: *May 9, 2007*

*John L. Brownlee* (signature)
John L. Brownlee
United States Attorney
Western District of Virginia

Rick A. Mountcastle, Assistant United States Attorney
Randy Ramseyer, Assistant United States Attorney
Sharon Burnham, Assistant United States Attorney
Barbara T. Wells, Trial Attorney, U.S. Dept. Of Justice
Elizabeth Stein, Trial Attorney, U.S. Dept. Of Justice